IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2017

**IN RE KANDACE D.**

**Appeal from the Circuit Court for Bradley County**
**No. V-15-869        Lawrence Howard Puckett, Judge**

_____

**No. E2017-00830-COA-R3-PT**

_____

This appeal involves the termination of a father's parental rights to his minor child. The child's physical custodians petitioned to terminate the father's parental rights. The trial court found that the petitioners had established, by clear-and-convincing evidence, three grounds for termination: (1) abandonment by an incarcerated parent, with the parent having exhibited a wanton disregard for the welfare of the child prior to his incarceration; (2) incarceration with a child under age eight and a prison sentence of ten years or more; and (3) persistence of the conditions that led to the child's removal from the father's home. The trial court also determined that termination of the father's parental rights is in the child's best interest. The father appeals the three grounds for termination found by the trial court.  The father also appeals the trial court's finding that termination of his parental rights is in the child's best interest.  We reverse as to the ground of persistence of conditions, but affirm termination of the father's rights on both other grounds. We also affirm the trial court's conclusion that termination of the father's parental rights is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Zachary D.

David K. Calfee, Cleveland, Tennessee, for the appellees, Jason M. and Earon M.

Herbert H. Slattery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General and W. Derek Green, Assistant Attorney General, for the intervenor-appellee, State of Tennessee.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

Beth D. ("Mother") and Zachary D. ("Father," or "Appellant") are the biological parents of one minor child, Kandace D. (d.o.b. June 2013) ("the Child").[1] Father appeals the termination of his parental rights to the Child.[2]

On June 6, 2014, the Department of Children's Services ("DCS") received a referral alleging that the Child was being subjected to nutritional and environmental neglect. Based upon the referral, Jillian Shaw, a DCS investigator, visited the home of Mother and Father. Father was not present, but Mother invited Ms. Shaw into the residence. Ms. Shaw later testified that she observed the home to be covered with laundry, trash, bugs, and what appeared to be dog urine. After photographing Father's residence, Ms. Shaw learned that the Child had been living with David W. and Marie W., the next-door neighbors (together, the "W.'s"), for approximately one month. Ms. Shaw visited the W.'s home, and observed that the Child was small for her age, and she was showing visible signs of malnourishment, including budding breasts and a protruding stomach. After speaking with the W.'s and observing the Child, Ms. Shaw determined that it was necessary to move forward with the DCS investigation. Accordingly, Ms. Shaw arranged for Marie W. and Mother to bring the Child to the hospital emergency room on the next day. The Child was released from the hospital after a one-night stay with instructions to follow up with her regular doctor. After an appointment with her regular doctor, the Child was admitted to the hospital for a second stay. The Child spent four nights during this second visit; Marie W. testified that neither Father nor Mother visited the Child during her four-night hospital stay.

On June 10, 2014, DCS filed a Petition in Juvenile Court to Transfer Temporary Legal Custody to the Neighbors and for an *Ex Parte* Order, asking the trial court to find the Child dependent and neglected and to award temporary legal custody to the W.'s. On June 10, 2014, the trial court entered a protective custody order awarding emergency custody to the W.'s. At the preliminary hearing on June 17, 2014, both parents consented to the transfer of temporary legal custody of the Child to the W.'s. The trial court then entered an Adjudicatory Order on June 19, 2014, finding that the Child was dependent and neglected, and awarding the W.'s temporary legal custody. On October 31, 2014, Father pled guilty to a multitude of felonies, and he was sentenced to serve ten years in the Tennessee Department of Corrections.

---

[1] In termination of parental rights cases, it is the policy of this Court not to use the last names of minor children and other parties in order to protect their identities.

[2] Mother voluntarily surrendered her parental rights at the final hearing on March 30, 2017, and Father is the only parent appealing the termination of parental rights.

Sometime later, the W.'s gave physical custody of the Child to Earon M. and Jason M., the petitioners in this case.[3] On December 7, 2015, Earon M. and her husband Jason M., filed a petition to terminate Father's parental rights and for the adoption of the Child. The petition alleged that Father had been in-and-out of prison over the course of the Child's life, that he was currently incarcerated with a prison sentence of ten years, and that termination of his parental rights was in the best interest of the Child. Specifically, the petition averred that Father was incarcerated from May 7, 2014 through May 18, 2014, and from September 29, 2014 through August 26, 2016. The petitioners also averred that the Child had been living with them for several months, and that they had a strong bond with the Child. The petition also alleged that Mother was prepared to voluntarily surrender her parental rights, and a "Waiver of Interest and Notice" signed by Mother was also filed with the petition.

On February 17, 2016, the trial court awarded legal custody to Earon M. and Jason M. On October 31, 2016, Father filed a "Motion for Visitation/ Return Custody," which petitioners opposed. Father's motion was denied. On February 15, 2017, petitioners filed an amended petition to terminate Father's parental rights and for the adoption of the Child. The amended petition averred that Father's rights should be terminated on the following grounds: incarceration with a sentence of ten years or more and a child under eight years of age at the time the sentence is entered by the court; abandonment by willful failure to visit or support; incarceration at the time of the filing of the original petition and willful failure to visit or support during the four months preceding incarceration; incarceration at the time of the filing of the original petition with Father having engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the Child; severe abuse; and because the Child had been removed from the Father's home for six months by the order of a court and the conditions leading to her removal or other conditions that in all probability would cause the Child to be subjected to further abuse or neglect still persisted and were unlikely to be remedied (commonly referred to as "persistence of conditions").[4]

On March 30, 2017, a hearing was held on the petition to terminate Father's parental rights. Mother, Father, Marie W., David W., Ms. Shaw, and Earon M. testified. By order of April 25, 2017, the trial court terminated Father's parental rights on the following grounds: (1) abandonment by an incarcerated parent with the parent having exhibited behavior demonstrating a wanton disregard for the welfare of the Child, prior to his incarceration; (2) Father's sentence to serve ten years in a correctional facility which

---

[3] The W.'s gave physical custody to the petitioners without the trial court's knowledge or permission. However, the trial court later awarded legal custody to the petitioners.

[4] In closing arguments, Appellees withdrew their claim of severe abuse, and the trial court did not rely on the ground in terminating Father's parental rights. Therefore, we will not address this ground.

was imposed when the Child was under the age of eight;[5] and (3) persistence of the conditions that led to the Child's removal. The trial court also found by clear-and-convincing evidence that termination of Father's parental rights was in the Child's best interest. Father timely appealed.

## ISSUES

Father has presented several issues for our review, which we restate as six issues, as follows:

1. Whether the trial court erred in terminating Father's parental rights on the ground of abandonment by incarceration, and upon a showing of evidence that Father exhibited a wanton disregard for the welfare of the Child prior to his incarceration.

2. Whether the trial court erred in terminating Father's parental rights on the basis of Tennessee Code Annotated Section 36-1-113(g)(6).

3. Whether the trial court erred in terminating Father's parental rights on the ground of persistence of conditions.

4. Whether the trial court erred in holding that termination of Father's parental rights is in the best interest of the Child.

5. Whether Tennessee Code Annotated Section 36-1-113(g)(6) is constitutional, as-applied to Father.

6. Whether the trial court committed reversible error by permitting Ms. Shaw to testify, admitting documents from the dependency and neglect proceedings, and admitting alleged hearsay from the Child's medical records.

## STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). While this right is fundamental, it is not absolute, and the right "continues without

---

[5] Father challenged the constitutionality of Tennessee Code Annotated Section 36-1-113(g)(6) at the trial court level. During the termination hearing, all parties, including the Tennessee Attorney General, made oral arguments regarding the as-applied constitutional challenge. The trial court denied Father's as-applied constitutional challenge at the trial and by separate written order of July 15, 2017.

interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *See In re Marr*, 194 S.W.3d 490, 495 (Tenn. Ct. App. 2005) (citation omitted). The state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, No. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A party seeking termination of a parent's rights to his or her child must prove both the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the gravity of the consequences in termination of parental rights cases, Tennessee courts impose a heightened standard of proof—clear-and-convincing evidence—for the parent's benefit. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). The clear-and-convincing-evidence standard ensures that the facts supporting the statutory grounds for parental rights termination are highly probable. *In re Carrington*, 483 S.W.3d at 522. Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

The heightened burden of proof applies to both the initial determination of whether statutory grounds for termination have been established and whether termination is in the best interest of the child. *Id*. First, the petitioner must establish, by clear-and-convincing evidence, at least one of the statutory grounds for termination of the parent's rights. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010). Second, the petitioner must prove, by clear-and-convincing evidence, that termination of the parent's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Carrington*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear-and-convincing evidence of grounds for termination.") "These requirements ensure that each parent receives the constitutionally required 'individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away.'" *See In re Carrington*, 483 S.W.3d at 523 (quoting *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)).

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must also modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). On appeal, we review the trial court's findings of fact "*de novo* on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112

(Tenn. 2013); Tenn. R. App. P. 13(d). We must then make our "own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear-and-convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## DISCUSSION

## I. TERMINATION OF PARENTAL RIGHTS

The trial court relied on the following statutory grounds in terminating Father's parental rights: (1) abandonment by incarceration, with Father having exhibited a wanton disregard for the Child's well-being prior to his incarceration; (2) Father's confinement to a correctional facility under a sentence of ten years when the Child was approximately one year old; and (3) persistence of the conditions that led to the Child's removal. Although only one ground must be proven by clear-and-convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to conduct our own review to determine whether clear-and-convincing evidence supports each ground relied upon by the trial court. *See In re Carrington*, 483 S.W.3d at 523; *In re M.L.P.*, 228 S.W.3d 139, 144 (Tenn. Ct. App. 2007) ("As long as one statutory ground for termination is established by the facts in [the] case and termination is in the best interest of the [child], the trial court's decision will be sufficiently supported.") Accordingly, we will review all three of the foregoing grounds relied upon by the trial court to determine if at least one statutory ground is established, and if so, whether clear-and-convincing evidence supports termination of Father's parental rights.

## A. Grounds for Termination

## 1. Abandonment by Incarceration: Tennessee Code Annotated Section 36-1-102(1)(A)(iv)

We first turn to review the trial court's determination that Father abandoned the Child by engaging in conduct prior to his incarceration that exhibited a wanton disregard for the Child's welfare. The termination of a parent's rights to his or her child may be initiated as a result of the parent's abandonment of the child. Tenn. Code Ann. § 36-1-113(g)(1). "Abandonment" occurs when a parent is incarcerated at the time a petition to terminate his or her parental rights is filed, and the parent has "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."[6] Tenn.

---

[6] Tennessee Code Annotated Section 36-1-102(1)(A) provides, in relevant portion:

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for

- 6 -

Code Ann. § 36-1-102(1)(A). "We have previously held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re C.T.S.*, 156 S.W.3d 18, 25–26 (Tenn. Ct. App. 2004). When considering whether this ground for termination has been established, "Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero." *In re Jai'Shaundria D.L.R.*, No. M2011-02484-COA-R3-PT, 2012 WL 224424, at *4 (Tenn. Ct. App. Jun. 15, 2012). As this Court has previously explained, "a parent's incarceration is merely 'a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental conduct that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the child.'" *Id.* (quoting *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005)).

As to this ground, the trial court made the following findings:

On or about the 31st day of October, 2014, [Father] pleaded guilty in three (3) separate felony cases to a total of seven (7) felony charges. While the first of these three (3) cases occurred prior to the Child's birth, two (2) cases encompassing six (6) different felony charges occurred during the Child's lifetime.

\*\*\*

That the minor child was removed from the care of [Father] on or about the 7th day of June, 2014, and adjudicated dependent and neglected due to environmental and nutritional neglect.

That [Father] continued to engage in criminal activity, which resulted in his incarceration on or about the 29th day of September 2014, until the 26th day of August, 2016.

---

adoption, "abandonment" means that:

. . .

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding, the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

The [Father]'s criminal activity, as well as the previous adjudication for environmental and nutritional neglect represents a wanton disregard for the welfare of the minor child.

That [Father]'s behavior was willful and intentional. [Father] made the choice to engage in behavior that removed him from being able to parent his child.

The petitioners bore the burden to prove, by clear-and-convincing evidence, that Father was incarcerated at the time the petition was filed, and exhibited behavior that displayed a wanton disregard for the welfare of the Child prior to his incarceration. It is undisputed that Father was incarcerated when the petition was filed on December 7, 2015. The question, then, is whether Father's behavior prior to incarceration displayed a wanton disregard for the welfare of the Child. In this regard, the evidence in the record amply supports the trial court's finding in the affirmative.

The W.'s testified extensively concerning the dangerous conditions that the Child was subjected to under Father's care. Marie W. testified that, before she physically took custody of the Child, she visited Father's home daily and found that the Child was not being fed regularly and her skin was peeling off because of diaper rash. Specifically, the following exchange occurred when David W. was testifying about the conditions the Child was subjected to under Father's supervision:

Q: Now was there anything in particular about the way they treated the child that gave you cause for concern?

A: The way the child was not taken care of and the diapers changed and all of that, yes.

Q: . . . could you explain that to the Court[?]

A: Okay. Like, we would have her, you know, we're going to take [The Child] We'd have her three to five days, whatever. She'd have a real, real bad diaper rash. I mean extremely horrible. We'd get it cleaned up, get it looking good. All right. Then we got things to do for a couple days. All right. We'd get back, we'd go back over there, we'd take the child back, same thing; real—**just horrible, bad diaper rash.**

Q: Is that something that you had tried to discuss with [Mother and Father]?

A: Yes.

Q: And how did they react?

- 8 -

A: We even bought her a tube of A&D ointment—that's what we used to get rid of it—and give it to [Mother] for this purpose.

Marie W. testified that she never witnessed Father change a diaper or feed the Child, and that Father interacted with the Child minimally and appeared disinterested. David W. testified that Father regularly spun the Child and dropped the Child in a dangerous way while "playing."  When David W. told Father to stop, Father responded, "[The Child] likes it."

During her first visit to Father's home, Ms. Shaw observed that the conditions were unsafe for any child.  The trash and laundry on the floor prevented the back door from closing, and dog urine and plywood covered the floor.  After observing that the Child was showing the physical signs of malnutrition, Ms. Shaw moved forward with her investigation and sought a physical examination and medical records for the Child.  The Child ultimately spent four days in the hospital recovering.

Father's criminal behavior outside the home also supports the trial courts finding that he exhibited a wanton disregard for the welfare of the Child. As mentioned previously, Father was arrested several times before DCS became involved, and pled guilty to a total of six felonies in October 2014.  When he was released, he violated his probation.  He testified that he smoked marijuana in prison, and that he was living with a drug user upon his release.

Father's neglect of the Child and criminal activity demonstrates that he is unfit for his role as a parent to the Child. Having fully reviewed the record, we find that there is clear-and-convincing evidence to support the trial court's termination of Father's parental rights on this ground.

### 2. Incarceration with a Sentence Over Ten Years and a Child Under Age Eight: Tennessee Code Annotated Section 36-1-113(g)(6)

The trial court terminated Father's parental rights based upon Tennessee Code Annotated Section 36-1-113(g)(6), which provides the following as a ground for termination of parental rights:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight years of age at the time the sentence is entered by the court.

Although Father does not take issue with the trial court's conclusion that clear-and-convincing evidence supports this ground for termination of his parental rights, we are required to make our own determination as to whether clear-and-convincing evidence

supports each ground for termination relied upon by the trial court. *See In re Carrington*, 483 S.W.3d at 523. Accordingly, we turn to evaluate whether clear-and-convincing evidence supports this ground for termination.

The petitioners bore the burden to establish, by clear-and-convincing evidence, that Father was convicted of a crime and sentenced to a prison term of ten or more years, and the Child was under the age of eight at the time the sentence was entered. Tenn. Code Ann. § 36-1-113(g)(6). The record indicates that on October 31, 2014, Father was sentenced to a total of ten years of confinement in the Tennessee Department of Corrections after pleading guilty to multiple felonies.[7] It is undisputed that the Child was approximately one-year old when Father was sentenced. Accordingly, we conclude that the record contains clear-and-convincing evidence to support the trial court's termination of Father's parental rights based upon this ground.

### 3. Persistence of Conditions: Tennessee Code Annotated Section 36-1-113(g)(3)

Parental rights may be terminated for persistence of conditions when:

(g)(3) [t]he child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36–1–113(g)(3). "The purpose behind the persistence of conditions ground for terminating parental rights is to prevent the child's lingering in the uncertain status of foster care if a parent cannot within a reasonable time demonstrate an ability to

---

[7] Specifically, Father pled guilty to felony theft of property, and he was sentenced to three years. Father pled guilty to aggravated burglary, and he was sentenced to four years to be served consecutive to his three year sentence. Father also pled guilty to burglary other than a habitation, and he was sentenced to serve an additional three years consecutive to his sentence for felony theft of property and aggravated burglary. In total, Father was ordered confined under a sentence of ten years. Father also pled guilty to several other charges; however, those sentences were to be served concurrently with his sentence of ten years. Copies of Father's convictions are contained in the record on appeal.

provide a safe and caring environment for the child." *See In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *4 (Tenn. Ct. App. Sept. 19, 2016) (internal citation and quotation marks omitted). "As a threshold requirement for the applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Damien G.M.*, No. E2016-02063-COA-R3-PT, 2017 WL 1733867, at *3 (Tenn. Ct. App. May 3, 2017).

The trial court found that petitioners established that Father's parental rights should be terminated on the ground of persistence of the conditions that led to the Child's removal from his custody. Tenn. Code Ann. § 36-1-113(g)(3). The trial court's conclusion was based, in part, on its initial finding that, "the minor child was removed from the home of [Father] and co-petitioner [Mother] on or about the 7th day of June, 2014, due to allegations of environmental neglect and malnutrition." However, the record indicates that the Child was not actually living in Father's home when DCS became involved in this case. The testimony of Ms. Shaw, Marie W., and David W. all indicated that the Child had been living with the W.'s for over a month when DCS initiated its investigation. The following exchange occurred when Marie W. was asked to explain how the Child began living at her home a month before DCS began its investigation:

> A. [S]he was living with us for a month before DCS come and got her—or was coming to get her.
>
> Q: Can you describe for the Court how that came to occur?
>
> A: Went over there one day and—I'm sorry. The baby was crying and [Mother] was in the bed with a pillow over her head. So I just got [the Child's] clothes together and I picked [the Child] up and I told [Mother], I said, I'm taking her home with me. She said, Okay.
>
> Q: Was Father there when this occurred?
>
> A: No.

The ground of persistence of conditions requires both that the child be adjudicated to be dependent and neglected and that the child be removed from the parent's home by DCS. *See In re Damien*, 2017 WL 1733867, at *4 (citing Tenn. Code Ann. 36-1-113(g)(3) ("The child has been removed from the home of the parent[.]"). Here, the record clearly indicates that the Child had already been removed from Father's home by Marie W. with the biological parents' consent at least one month before DCS became involved. Accordingly, we reverse the trial court as to the grounds of persistence of conditions.

- 11 -

## B. Best Interest of the Child Analysis

When at least one of the statutory grounds for termination of a parent's rights to his or her child has been established, the petitioner must then prove, by clear-and-convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994)). Not all parental misconduct is irredeemable. *See In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at * 8 (Tenn. Ct. App. Aug. 30, 2017). Accordingly, the statutes governing the termination of parental rights recognize that termination may not always serve the child's best interest. *Id*. However, when the interests of the parent and the child conflict, the courts must always resolve the conflict in favor of the rights and best interest of the child. *Id*. Tennessee law provides that a court may consider the following factors when determining whether termination of parental rights is in the child's best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent and guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child, or another child or assault in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

- 12 -

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The factors enumerated above are not exhaustive, and "[t]he statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dep't of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-PT, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002). In some cases, the consideration of a single factor, or facts outside the statutory factors, may dictate the outcome of the court's analysis. *See In re Miracle*, 2017 WL 3836020, at * 8.

The trial court made detailed findings concerning the factors enumerated above, and concluded that clear-and-convincing evidence supports termination of Father's parental rights. We now turn to conduct our own evaluation as to whether clear-and-convincing evidence supports the trial court's conclusion that termination of Father's parental rights is in the Child's best interest.

Marie W., David W., and Ms. Shaw testified that the condition of Father's house that the Child was being subjected to before moving in with the neighbors was unsafe for children. Ms. Shaw testified that the home was covered in bugs, trash, laundry, and dog urine. David W. testified that Father's home was not properly heated, and Father paid little to no attention to the Child. David W. testified that he got into several arguments with Father because Father was "playing" with the Child in a way that the W.'s perceived to be dangerous and inappropriate. The W.'s both testified that they were very concerned that the Child was not being properly fed.

Father was in and out of jail during the months preceding the beginning of the DCS investigation concerning the Child. Father testified that he had absolutely no contact with the Child from September 29, 2014 to August 26, 2016 because he was incarcerated after pleading guilty to several felonies, including aggravated burglary. He testified that he has seen the Child three times since his release from prison, but that the Child did not recognize who he was during his alleged visits.[8] Father testified, "[s]he didn't call me daddy. I don't think she knows me as daddy. She knows [the petitioners] as daddy now [sic]." Father estimated that he has spent approximately one and a half hours with the Child since he was imprisoned in September of 2014. He testified that he has never provided monetary support, diapers, toys, baby food, or other supplies since the Child

---

[8] Marie W. and David W. testified that two out of three of these alleged visits with Father never occurred.

began living with the neighbors in May of 2014. Father testified that he had been living with his girlfriend in a trailer until the week before trial, but they had broken up because he suspected that she was using drugs.

Earon M. testified that the Child has been doing very well, and the couple intends to adopt the Child as soon as possible. Earon M. testified that she and her husband have stable jobs, and they are able and willing to financially support the Child. She reported that the Child is doing well in pre-school and has many friends. The following exchange took place when Earon M. was asked to describe her relationship with the Child:

A. I love her so much. She's the best thing that's ever happened to me. We have a very strong mother-daughter bond, we really do. And I would do anything for her and will continue to.

Q: Okay. What about her relationship with your husband?

A: Well, as you can see, he's crying. We love her very, very much and we're her parents. We're her mommy and daddy. We're there when she has a bad dream. We're there when she skins her knee. We're there if she has a bad day at school. We're there. We're mommy and daddy; bottom line.

Earon M. testified that she did not see any benefit in the Child having any visitation with Father at any time in the future.

Father's past actions provide little indication that he will be capable of being a proper parent to the Child at any time in the near future. Earon M. testified that the M.'s love the Child, and desire to adopt her. Having carefully considered the testimony and record, we find that clear-and-convincing evidence supports the trial court's conclusion that termination of Father's parental rights is in the best interest of the Child.

## II. AS-APPLIED CONSTITUTIONAL CHALLENGE TO TENNESSEE CODE ANNOTATED SECTION 36-1-113(g)(6).

Father argues that termination of his parental rights based upon Tennessee Code Annotated Section 36-1-113(g)(6) is unconstitutional, as-applied to him because on August 26, 2016, after approximately two years in prison, Father was released on parole.[9] According to Father, he is now available to parent the Child. Therefore, Father argues,

---

[9] In contrast to a facial challenge, which involves the constitutionality of a statute as written, "[a]n 'as applied' challenge to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations." *City of Memphis v. Hargett*, 414 S.W.3d 88, 107 (Tenn. 2013). Father concedes that Tennessee Code Annotated Section 36-1-113(g)(6) is facially constitutional, as we have held in many other cases. *See, e.g.*, *In re T.M.G.*, 283 S.W.3d 318 (Tenn. Ct. App. 2008).

the trial court's reliance on this ground is not narrowly tailored to serve a compelling state interest, and termination of his rights on this ground would violate his fundamental right to parent under Article I, Section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution.

Termination of Father's rights on this ground is irrelevant to the outcome of this appeal, as we have concluded that clear-and-convincing evidence supports termination of Father's parental rights on another ground, and only one of the statutory grounds for termination must be proven. When the outcome of a constitutional claim is inconsequential to the outcome of a case, we decline to address the constitutional question raised. *See Haynes v. City of Pigeon Forge*, 883 S.W.2d 619, 620 (Tenn. Ct. App. 1994) ("[U]nder Tennessee law, our courts do not decide constitutional questions unless the issue's resolution is absolutely necessary for determination of the case and the rights of the other parties.") Accordingly, it is not necessary for us to address this issue, and it is pretermitted.

### III. EVIDENTIARY ISSUES

Appellant claims that the trial court erroneously admitted several forms of evidence. Before turning to the Appellant's specific claims of error, we first note that "[d]ecisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). Thus, reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion." *Id*. (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). An abuse of discretion will only be found where the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citing *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). "An appellate court should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222–23 (Tenn. Ct. App. 1999) (citation omitted).

### A. DCS Caseworker's Testimony

Father first argues that the trial court erred by allowing Ms. Shaw, the DCS case worker, to testify. Specifically, Father argues that Ms. Shaw's testimony should have been excluded pursuant to Tennessee Code Annotated Section 37-1-409, which protects the confidentiality of information included in reports of child abuse, including the identity of the reporter. However, Tennessee Code Annotated Section 37-5-107 specifically provides that under certain circumstances, such as the circumstances of this case, DCS may provide otherwise confidential information to the courts for the purpose

of protecting a child from abuse or neglect.[10] These proceedings have the principle purpose of preventing future neglect of the Child by Father. Accordingly, we discern no error with the trial court's decision to admit Ms. Shaw's testimony.

## B. Petition, Affidavit, and Protective Custody Order from the Dependency and Neglect Proceedings

Father contends that the petition, affidavit of Ms. Shaw, and protective order from the dependency and neglect proceedings contained hearsay, and should not have been admitted. We reiterate that the admissibility or exclusion of evidence rests within the trial court's discretion, and we will only reverse those evidentiary decisions for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)); *Pack v. Boyer*, 438 S.W.2d 754, 758 (1968). When Appellant's attorney objected to the admission of these documents, the trial judge instructed that the petition, affidavit, and protective order were not admitted to prove the truth of the matters asserted by the documents. Rather, the trial judge admitted the aforementioned documents for context, so that the adjudicatory order could be understood. Father agrees that the Juvenile Court's Adjudicatory Order was properly admitted. The information contained in the aforementioned documents is also contained in the Juvenile Court's Adjudicatory Order on dependency and neglect. Furthermore, the Court notes that Tennessee Rule of Appellate Procedure 36(b) provides, in part:

> A final judgment from which relief is available and otherwise appropriate, shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

The record also contains clear-and-convincing proof in the form of testimony from Marie W., David W., Earon M., Ms. Shaw, and Father and Father's criminal records, sufficient to support this Court's holding in this case. Accordingly, any error the trial court committed in admitting hearsay contained in the petition, affidavit, and protective custody order was harmless, because the judgment is supported by alternative competent evidence. *See Berke v. Chattanooga Bar Ass'n*, 436 S.W.2d 296, 304 (Tenn. Ct. App.

---

[10] The statute provides numerous exceptions to the confidentiality of DCS records, including Tennessee Code Annotated Section 36-1-612(h) which provides:

> For purposes directly connected with the administration of this part and part 4 of this chapter, the department may disclose any relevant information to the court, administrative board or hearing officer, the parties or their legal representatives in any proceedings that may be brought in any court, or before any administrative board or hearing officer, for the purpose of protecting a child or children from child abuse or neglect or child sexual abuse.

1968). We discern no reversible error with the admission of the aforementioned documents.

### C. Medical Records & Qualifications of Ms. Shaw to Testify

Father contends that some information contained in the medical records is hearsay and should have been excluded from the evidence admitted at trial. While Father concedes that the records themselves fell within the statutory exception to the hearsay rule, he argues that the particular statements concerning the diagnoses in the records for failure to thrive, microcephaly, and sexual precocity are hearsay; thus, presenting a case of hearsay within hearsay and rendering the diagnoses inadmissible. At trial, the judge indicated that the medical records were admissible as medical records, business records, or statements made for the purposes of medical diagnosis or treatment. *See* Tenn. R. Evid. 803(4); 803(6); 805. As required by the rule, the records were accompanied by an affidavit from the hospital's custodian of records. *See* Tenn. R. Evid. 803(6). The trial judge gave the limiting instruction that Ms. Shaw's statements in connection with the medical records were admissible to show the effect on the listener only in the course of her investigation—not the truth of the diagnoses.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *See* Tenn. R. Evid. 801(c). Because the diagnoses in the medical records were not admitted for the truth of the matters asserted, the statements were not hearsay.

Furthermore, Tennessee Rule of Evidence 803(4) provides the following exception to the general ban on hearsay evidence:

Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Furthermore, Tennessee Rule of Evidence 803(6) provides that the following is not excluded by the hearsay rule:

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, *or diagnoses* made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the

testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Even if the statements had been admitted for their truth, the statements, including the diagnoses, fell within the exceptions to the hearsay ban, and we discern no error with their admission.

## CONCLUSION

For the forgoing reasons, we reverse the trial court's termination of Father's parental rights on the grounds of persistence of conditions. We affirm the trial court's termination of Father's parental rights on the grounds of abandonment by incarceration with a sentence over ten years and abandonment by incarceration with Father having displayed a wanton disregard for the Child's well-being prior to his incarceration, and its determination that termination of Father's parental rights is in the Child's best interest. Father's as applied constitutional challenge is pretermitted. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Zachary D. Because Zachary D. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE